## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

ANGELA S. LEWIS,                    )
                                    )
      Plaintiff,              )
                                    )
   v.                            )    No. 18-cv-3097
                                    )
NANCY A. BERRYHILL,                 )
Acting Commissioner                 )
of Social Security,                 )
                                    )
      Defendant.              )

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Angela S. Lewis appeals from the denial of her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Lewis filed a Brief in Support of Motion for Summary Judgment (d/e 13) (Lewis Motion) .  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

Lewis protectively filed her application for SSI on April 18, 2014.  R. 78.  At that time, she also filed an application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  The last date she met the requirement for insured status to receive DIB was December 31, 2011 (Date Last Insured).   Lewis initially alleged that she became disabled on December 31, 2011 (Onset Date).   R. 80.  She subsequently amended the alleged Onset Date to May 13, 2014.  She has acknowledged that she is only eligible for SSI and is not eligible for DIB because her amended Onset Date is after her Date Last Insured.  R. 10, 32, 58-59.  She only appeals the denial of her SSI claim.

Lewis was born on October 25, 1970.  She completed high school. She previously worked as cook, waitress, and a manager at a gas station. R. 33-34, 52-53.  She last worked in  2011.  R. 87.  She did not engage in any past relevant work for purposes of her SSI application.  Lewis suffers from status-post total right hip replacement with subsequent repeated dislocations, cervical and lumbar degenerative disc disease, and status-post cervical fusion surgery.  R. 12, 19.

On May 20, 2013, Lewis saw Dr. Jennifer S. Schroeder, M.D. to establish care.  Lewis complained of left hip/back pain.  Lewis reported a

history of back pain.  She stated that the onset of the pain had been gradual.  She reported pain with movement.  The pain radiated to her hip. Lewis rated the pain as moderate and prolonged.  Lewis reported chronic pain in her left hip since she fell at the gas station at work five years earlier. Lewis said she "just wants pain meds.  In fact, requests several times."  R. 311.

On examination, Dr. Schroeder observed that Lewis had a normal gait, no neck tenderness, normal neck range of motion, no thoracic or lumbar spine tenderness, normal range of motion in the lumbar spine, no hip joint tenderness, normal range of motion in her hips, normal knee range of motion, no joint laxity, no muscle weakness, and no decreased muscle tone.  Dr. Schroeder assessed back pain with radiation.  R. 313.  Dr. Schroeder recommended physical therapy, but Lewis said she could not afford it.  Dr. Schroeder prescribed meloxicam and tramadol for pain.  R. 314.

On June 17, 2013, Lewis saw Dr. Schroeder for continued leg pain. Lewis reported that she did not think that the meloxicam helped.  She stated that the tramadol "definitely did not help."  R. 308.  Dr. Schroeder assessed back pain with radiation.  She increased the dosage on the

meloxicam, discontinued the tramadol, and prescribed hydrocodone-acetaminophen (hereinafter "hydrocodone").  R. 309.

On August 14, 2013, Lewis saw Dr. Schroeder for right hip pain. Lewis said that the hydrocodone did not help, but "was better than doing nothing."  Lewis said she sat in a chair or lay in bed all day due to pain. Dr. Schroeder increased the dosage of meloxicam and continued the hydrocodone prescription.  Dr. Schroeder recommended steroid injections, but Lewis declined.  R. 306.

On January 22, 2014, Lewis saw Dr. Schroeder for chronic back, hip, and knee pain.  Dr. Schroeder noted that Lewis was reliant on pain medication.  Lewis was taking one hydrocodone tablet every six hours.  R. 299.  Dr. Schroeder administered steroid injections into Lewis right groin and knee for pain.  R. 300.

On April 11, 2014, Lewis saw Physician Assistant Steven W. Dement, PA-C.  Dement worked with orthopedic surgeon Dr. George Crickard, M.D. Dr. Schroeder referred Lewis to Dr. Crickard for chronic right hip pain. Lewis reported that the hip pain was constant.  She rated the pain at 8-10. She said the pain interrupted her sleep.  Lewis said the pain was getting worse.  She reported that the pain was exacerbated by walking, lifting,

twisting, and kneeling.  She reported that hydrocodone did not manage her pain well.  R. 390.

On examination, Lewis had no tenderness, but severe limitation on internal rotation of her right hip.  Lewis had good strength in her hip.  X-rays showed bands of osteoarthritic changes with sclerosis and hypertrophic spurring, but no acute osseous abnormalities.  Dement opined that Lewis was "probably headed for a right total arthroplasty (hip replacement)."  Dement scheduled her to seek Dr. Crickard for a surgical consultation.  Dement prescribed 6 hydrocodone a day for pain.  R. 390.

On August 13, 2014, x-rays of Lewis's right hip showed degenerative changes in her right hip with obliteration of the joint space.  R. 316.

On August 14, 2014, Lewis saw Dr. Crickard for a steroid injection in her right hip and joint aspiration of her right knee.  On examination, Lewis's left hip was normal.  Lewis's right hip was tender but had normal range of motion and normal strength.  Dr. Crickard administered the steroid injection into her hip and had an assistant aspirate her right knee.  Lewis tolerated the procedures and had no immediate complications.  R. 353-54.

On September 18, 2014, Lewis saw state agency physician Dr. Joseph Kozma, M.D., for a consultative examination.  R. 317-21.  Lewis stated that she last worked in 2011.  She said she could not work because

of pain in her right leg.  She said she had pain that radiated down to her right knee.  She rated the pain as a 7 out of 10 and constant.  She said she could not carry 25 pounds because of the pain.  She said she had injections in the hip, but they were not effective.  R. 317.  On examination, Lewis had normal muscle tone, normal range of motion, and no tenderness in the cervical spine.  Her upper extremities were normal.  Lewis had normal muscle development in her lower extremities, reduced range of motion in her hips.  She had no tenderness or swelling in any of her joints.  Lewis's lumbar spine had no tenderness and normal muscle tone.  R. 318-19.

Lewis refused to heel walk or toe walk for Dr. Kozma.  Lewis squatted one fourth of the way down.  Lewis's gait was normal.  Straight leg testing was positive on the right.  R. 319.  Lewis's grip strength and her ability to feel and manipulate objects in her hands were all normal.  She had 5/5 grip strength.  Dr. Kozma stated, "During examination definite evidence of symptom magnification was noted."  Dr. Kozma diagnosed chronic pain in the right leg, cause undetermined and peripheral neuropathy in the right leg.  R. 321.

On September 25, 2014, state agency physician Dr. Sumanta Mitra, M.D. prepared Physical Residual Functional Capacity Assessment.  R. 64-

66.  Dr. Mitra opined that Lewis could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for two hours in an eight-hour workday (workday); sit six hours in a workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  R. 65-66.

On September 29, 2014, Lewis saw Dr. Schroeder for a medication adjustment for her hip pain.  Lewis did not have a current prescription for pain medications at the time of this visit.  Lewis reported that she had recommendation for hip replacement surgery.  Lewis reported that the surgery has not happened because Lewis's transportation was not reliable.  Lewis lived in Versailles, Illinois.  R. 61.  Dr. Schroeder adjusted her pain medications and recommended that she consider having the recommended surgery.  R. 357.

On November 3, 2014, Lewis was admitted to Blessing Hospital in Quincy, Illinois, and underwent right hip total arthroplasty, or hip replacement surgery.  Dr. Crickard performed the surgery.  Lewis received two sessions of physical and occupational therapy after surgery.  Lewis was discharged November 5, 2014.  She was stable when she was discharged.  Lewis was homebound after the surgery and needed in-home care from a nurse, physical therapist, and occupational therapist.  Dr.

Crickard stated that Lewis needed both the assistance of another person and an assistive device to leave home. Dr. Crickard prescribed a walker and a cane. Dr. Crickard stated that Lewis would need the walker and cane for three months. R. 331.

On December 3, 2014, Lewis saw Dr. Schroeder for compacted wax in her ears. Lewis reported that she could not see improvement from the surgery. Dr. Schroeder noted that Lewis was dependent on hydrocodone. Dr. Schroeder's nurse cleared Lewis's ears. Dr. Schroeder refilled Lewis's hydrocodone prescription. Dr. Schroeder noted, "Monitor her refills as I am concerned this will trun (sic) into a chronic need for her. Unfortunately right now, I don't see where she has gotten benefit from the hip surgery." R. 374.

On December 9, 2014, Lewis saw Physician Assistant Dement in Dr. Crickard's office. Lewis reported that she fell the day after Thanksgiving. She saw Dr. Schroeder. She had some swelling at her incision. She reported that the swelling has gone away, but she still had some soreness. R. 370, 428. On examination, Lewis used a cane to ambulate and her gait and station were unremarkable. Her incision was healed, and she had no significant swelling. She had tenderness over the incision. She had good range of motion in both hips and at least 4/5 strength. X-rays showed well

placed prosthesis and no acute osseous abnormalities on either hip.  R. 370, 428, 444.  She had mild osteoarthritic changes on the left hip.  R. 370, 428.  Dement recommended that she continue therapy and keep her next scheduled appointment on December 16, 2014.  R. 370, 428.

On January 15, 2015, Lewis went to the Blessing Hospital emergency room because her right hip replacement had become dislocated.  Dr. David M. Bingham, D.O., an orthopedic surgeon who was a partner of Dr. Crickard, saw Lewis in the emergency room on a consultation.  Dr. Bingham stated, "She admits that she has not been compliant with her hip precautions, stating that she does whatever she wants to with the hip." Lewis reported a fall in December that did not affect the hip replacement. Lewis reported minor chronic pain since the December fall.  Lewis reported that she walked the dog this morning.  After she got home, she sat on the couch and felt the hip go.  She could not walk.  Dr. Bingham stated that Lewis was in minimal pain and denied numbness or tingling.  Dr. Bingham corrected the dislocation ("reduced" the hip). R. 323-25, 340-41, 598-99, 605-07, 627.

On January 22, 2015, Lewis saw Dr. Crickard for continued hip pain. On examination Lewis had tenderness in both hips.  R. 434.  Dr. Crickard

stated that Lewis fell the day after Thanksgiving, and then had a dislocation a week before this office visit.  Dr. Crickard stated,

> We talked about her hip precautions and it appears like she is not following these the way I would like her to.  I reiterated this to her.  This may be a little hiccup.  This may become more permanent.  We need to watch her closely.  She needs to understand.

R. 435.

On April 27, 2015, x-rays of Lewis's cervical spine ordered by Dr. Schroeder did not show her odontoid.[1]  A CT scan was recommended.  R. 445.

On June 17, 2015, Lewis saw Dr. Schroeder with complaints of neck pain and lower back pain.  Lewis reminded Dr. Schroeder of her history of falls, "happening by history when she was intoxicated."  Lewis requested more hydrocodone.  R. 466, 676.  Lewis reported no balance or gait issues.  On examination, Lewis had normal range of motion.  Dr. Schroeder assessed neck and back pain and prescribed Neurontin (gabapentin).  R. 466-67, 676-77.

On June 26, 2015, Lewis again saw Dr. Kozma for a consultative examination.  R. 449-54.  Lewis reported that she had a great deal of pain

---

[1] The odontoid is a toothlike projection on the second cervical vertebra.  Stedman's Medical Dictionary (28ed. 2006) (Stedman's), at 1357.

all over from her hip replacement, arthritis throughout her body, and fibromyalgia.  Lewis reported that physical therapy did not help with the pain.  R. 449.  Lewis reported that she needs a cane to walk, but the cane had been stolen.  R. 450.

On examination, Dr. Kozma said upper extremities had normal muscle development, normal strength, and full range of motion in all upper extremity joints.  Lower extremities had normal muscle development and full range of motion in all joints.  Lewis had minimal tenderness in her lumbar spine.  Lewis had normal sensation and reflexes.  R. 452.  Lewis refused to attempt either heel or toe walking.  Lewis squatted halfway. Lewis had a normal gait, normal stride, and normal posture.  Straight leg testing was positive.  Lewis had normal grip strength and good finger dexterity.  Dr. Kozma stated as part of his examination that Lewis did not use crutches, canes, or other assisting devices.  Dr. Kozma noted that Lewis reported a stiff neck, but she had normal range of motion in her neck. R. 453.

On July 1, 2015, Lewis had an MRI of her lumbar spine.  The MRI showed marked accentuation of normal lumbar curvature, spondylosis of the lumbar spine with minimal central canal stenosis and mild to minimal neural foraminal narrowing, bilateral PARS abnormality at L5, grade 1

anterolisthesis at L5-S1, and possibly congenital endplate changes at T11. R. 472-75, 699-703.

On July 9, 2015, Lewis saw neurosurgeon Dr. Arden F. Reynolds, M.D., for neck and low back pain.  Lewis reported having a stiff neck and pain in her neck down into both arms.  Lewis reported that she was in a motor vehicle accident in the past.  She reported that the vehicle went off the road and she hit her nose on the steering wheel.  Lewis also reported that she had a roller accident in the past.  She reported pain in her neck that radiated into her arms and constant numbness.  The problem waxed and waned over time.  Lewis reported that she could perform her daily routine.  A cervical MRI showed possible spinal cord compression at the odontoid and cord and root compression at C5-6 and C6-7.  The lumbar MRI showed minor degenerative problems.  Dr. Reynolds recommended an evaluation for rheumatoid disease and a cervical CT scan.  Dr. Reynolds said he would reevaluate Lewis after these steps were completed.  R. 464.

On July 28, 2015, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Capacity Assessment.  R. 85-87.  Dr. Madala agreed with Dr. Mitra's September 25, 2014 assessment except Dr. Madala

opined that Lewis could stand and/or walk for six hours in an eight-hour workday.  R. 85-86.

On July 29, 2015, Lewis saw Dr. Reynolds.  A July 22, 2015, CT scan showed an old odontoid fracture with anterior displacement, and degenerative changes with probable canal compromise at 5-4 and 6-7.  Dr. Reynold concluded that Lewis "may well need" spinal surgery.  R. 465.

On August 2, 2015, Lewis saw Dr. Schroeder for neck and lower back pain.  Lewis reported no numbness or tingling in her arms or legs and some radicular pain in her right leg.  Lewis requested hydrocodone.  R. 676.  On examination, Lewis had normal range of motion, no gait or balance issue, and no dizziness.  Dr. Schroeder prescribed gabapentin.  R. 677.

On August 13, 2015, Lewis saw Dr. Reynolds for back pain and spontaneous clonus.[2]  Lewis reported burning pain from her neck down. She said her balance was bad.  She said she had a cane and a walker but did not use either.  Lewis reported spontaneous episodes of clonus where her arms and legs shook uncontrollably.  A cervical CT scan showed an old remote fracture of the odontoid, which migrated anterior to C-2.  Lewis also had significant arthritic changes at multiple levels of her neck.  R. 679.

---

[2] Clonus is involuntary spastic muscle contractions. See Stedman's, at 393.

On examination, straight leg testing was negative and Lewis had no lumbar spasm.  She had a cervical muscle spasm and scalene tenderness. Lewis's gait was slightly broad-based.  Her tandem gait was unsteady.  R. 680.  Dr. Reynolds assessed remote trauma with old odontoid fracture with abnormal anatomy secondary to healing.  Dr. Reynolds suspected that Lewis needed cervical spinal surgery.  Dr. Reynolds asked Lewis to use a walker at all times.  R. 681.

On October 4, 2015, Lewis saw Dr. Schroeder for neck pain.  Lewis reported that the pain was getting worse.  Lewis said she used a walker at home but did not bring it with her.  Dr. Schroeder wrote, "She is to have surgery for the dens fracture and cervical stenosis, yet she cannot get ride there."  R. 683.  On examination, Dr. Schroeder noted stiff neck movement. Dr. Schroeder increased Lewis's hydrocodone and gabapentin dosages for pain.  R. 684.

On October 20, 2015, Lewis went to the emergency room at Blessing Hospital for a dislocated hip.  R. 609-13, 633-34.  Lewis reported that she was walking the day before and the hip replacement dislocated.  She reported pain in the hip the past couple of weeks.  Lewis reported that the hip replacement dislocated once before this.  R. 609.  The hip dislocated on January 15, 2015.  The hip replacement was reduced after that dislocation.

R. 611.  On examination, the right hip was tender, but had good range of motion.  She had good strength of 4+/5.  X-rays showed dislocated right hip.  The x-rays showed that that reduction of the replacement was in good position.  R. 612.  Lewis was admitted to the hospital.  The orthopedic assessment notes stated that this was the second time the hip dislocated "after noncompliance with strict hip precautions. She understands that she will now have to wear an abduction brace."  The hospital notes stated a brace would be fabricated for her, that Lewis would be weightbearing as tolerated, would continue with therapies, and then would  be discharged. The assessment notes also stated, "With the patient's alcoholic background and smoking, we would like nutrition to see this patient about good choices for food and protein-based drinks possibly."  R. 612.

The discharge plan and follow-up notes stated:

> We would expect that this patient would be discharged probably by tomorrow after she gets her brace and she is able to mobilize with it.  It is going to be difficult for her to keep it on at all times.  She will have to wear it for three months.  She groaned when I told her this, and so I am not expecting much on the compliance level.  She will need to follow up with Dr. Crickard in two weeks.

R. 612.  The notes stated that Lewis would follow up with Dr. Crickard in two weeks.

On October 25, 2015, Lewis saw Dr. Schroeder. Lewis asked for more pain pills. Lewis reported that she could not get to Peoria to have cervical spinal surgery. Lewis reported her neck was worse. She denied any body tingling, paresthesia, or numbness. R. 686. Dr. Schroeder offered Lewis transportation to Peoria for her surgery, but Lewis declined. Dr. Schroeder wrote, "I am not sure why if she is so much pain (sic), that she declines the assistance." R. 688. Dr. Schroeder adjusted her hydrocodone prescription. R. 687-88.

On November 14, 2015, Lewis went to the emergency room with dislocated right hip replacement. R. , 592-93, 613, 638-40. Lewis was admitted to the hospital. On November 15, 2015, Dr. Rena Stewart, M.D., saw Lewis on a consultation. Dr. Stewart summarized Lewis's post-operative history and the circumstance surrounding the November 14, 2015 dislocation:

> HISTORY OF PRESENTING COMPLAINT: The patient is a 45-year-old patient of Dr. Crickard who underwent a total hip arthroplasty 11/3/2014, now one year ago. She unfortunately has been grossly noncompliant with her postoperative hip precautions and suffered her first dislocation 1/29/2015, approximately two months postoperatively when she bent forward, completely ignoring her hip precautions of 90 degrees of flexion. At that time, Dr. Bingham was able to perform a closed reduction of the hip and the patient was once again instruction (sic) extensively after her hip precautions.

Less than one month ago, 10/20/2015, the patient was once again intoxicated and flexed forward all the way to her feet and suffered a second postoperative dislocation. That dislocation was reduced in the emergency room. Th patient was admitted and had a custom hip abduction brace fashioned for her. She was given extensive education at the time and the very dire consequences of lack of compliance with hip precautions was outlined to the patient.

Unfortunately, last night the patient was grossly intoxicated with alcohol (ETOH level 0.259)[3]. She was not wearing her brace. She told me this morning that she "is not wearing the f'ing brace because it pinches her." She again bent completely forward flexing far beyond 90 degrees of the hip and suffered another dislocation. She was admitted in the night for this issue.

When I had examined the patient this morning, she still smells very heavily of alcohol and appears to still be somewhat intoxicated. She was very angry and used multiple profanities during our discussion. She states that she refuses to be compliant because she has to do work around her house. She states her family members do not help her because her boyfriend works 10 hours a day. She seemed absolutely belligerent in her belief that she will not follow hip precautions. She shows no remorse whatsoever at having not been following her precautions at the time of this dislocation. She stated repeatedly that she has to do her things around the house and this is the reason for her noncompliance. She denies chronic alcohol use, although the medical record does indicate multiple episodes of intoxication correspond with her hip dislocations. I am hopeful that I can interview the patient once again in a few hours when perhaps she is less intoxicated and we could have a more productive discussion.

---

[3] Operating a motor vehicle with a blood alcohol level exceeding 0.08 constitutes driving under the influence of alcohol in the State of Illinois. 627 ILCS 5/11-501 (2019).

R. 614. Dr. Stewart reduced the dislocation on November 15, 2015. Lewis was discharged on November 16, 2015. R. 639-40. Prior to discharge, Dr. Stewart "spoke to the patient extensively about her lack of compliance and I have told her very clearly that if she continues to be noncompliant with her hip precautions, she will virtually certainly dislocate this hip again." R. 618.

On November 18, 2015, Lewis returned to the Blessing Hospital with another dislocation of her hip. R. 587-90, 643. Lewis reported that she fell. R. 587. Her blood alcohol level (ETOH) was .249. R. 588. The emergency room staff reduced the hip. R. 643-44.

On November 20, 2015, Lewis saw Dr. Schroeder for a rash. Dr. Schroeder noted that Lewis had several hip replacement dislocations, and some were associated with Lewis's drinking. Dr. Schroeder told Lewis she would no longer prescribe hydrocodone for Lewis because of Lewis's drinking. R. 1020.

On December 1, 2015, Lewis saw Dr. Crickard for a one-year follow up on her hip replacement. Lewis reported that she was doing well. She reported no pain in her right hip. On examination, Lewis's incision was healed properly. Lewis had good stability throughout range of motion. X-rays showed the right hip replacement was "in excellent position. No sign

of loosening, bony reabsorption, excessive wear, mechanical failure, or

other complications noted."  R. 1028.

Dr. Crickard told Lewis to continue weightbearing and activity as

tolerated.   Dr. Crickard further noted:

> Angela has a complicated history.  She underwent a right total
> hip arthroplasty 11/3/2014.  She has dislocated it 3 times since
> then.  The first being 1/15/2015.  No blood alcohol level taken
> at the time.  The second was 10/21/2015, with a blood alcohol
> of .247.  the third time was 11/15/2015, with a blood alcohol
> 0.259.
>
> I discussed at length Angela's risks with repeated bouts with
> alcohol.  She understands how her hip reacts on alcohol in a
> relaxed state.  She states the primary care has refused to give
> her pain medicines and this is causing quite a bit of stress.  I
> explained the concerns with repeated pain medicines.  We
> discussed addiction.  I stated that this needs to be discussed
> with her primary care and she seemed to understand.  We did
> take an x-ray today and the components look in good position.

R. 1029.

On December 25, 2015, Lewis went to the Blessing Hospital

emergency room with a right hip replacement dislocation.  Lewis reported

that the hip dislocated due to overuse.  R. 733.  The emergency room staff

reduced the hip replacement back into place.  Lewis was released home.

R. 733-34, 739-40.

On January 17, 2016, Lewis went to the Blessing Hospital emergency

room with a dislocation of her right hip replacement.  Lewis reported that

since her total hip replacement in November 2014, she has had pain and continued dislocations. Lewis reported she fell and dislocated the hip replacement. She reported that she had a beer before she fell, "but not much more than she usually drinks." R. 792. Lewis was admitted to the hospital. R. 735. Her dislocated hip replacement was reduced, and she was discharged on January 19, 2016. R. 737-38, 792-98.

On February 4, 2016, Lewis went to the emergency room at Blessing Hospital because her hip replacement was dislocated. Lewis said she was walking toward her shower when her hip replacement popped and dislocated. Lewis was not wearing her brace at the time. Lewis stated that she had drunk two beers prior to arrival at the ER. Emergency room physicians reduced the hip back into place. At Dr. Crickard's request, the emergency physician drew blood for a blood alcohol test. Lewis was discharged and encouraged to avoid alcohol and wear her hip brace as previously instructed. R. 832. The blood alcohol test results showed that Lewis had a blood alcohol level of .210. R. 861.

On February 16, 2016, Lewis saw Dr. Crickard for a follow up. Lewis reported that she was doing well. She had no pain in her right hip. Dr. Crickard noted that, "Patient does have a history of dislocating her hip when she is intoxicated. We spoke about this today." R. 1038.

On examination, Lewis's right hip was tender in the greater trochanter.  She had normal range of motion in the right hip.  Her left hip was normal.  The incision from her surgery was completely healed.  She had good stability in her hip replacement throughout range of motion.  Her sensation and capillary refill were normal.  X-rays showed the hip replacement was in "excellent position.  No sign of loosening, bony reabsorption, excessive wear, mechanical failure, or other complications noted."  R. 1039.  Dr. Crickard told Lewis to continue weight bearing as tolerated and he would see her back in three months.  R. 1040.

On March 26, 2016, Lewis went to the emergency room at Blessing Hospital because her right hip replacement dislocated.  The emergency room physicians reduced the hip replacement back into place.  She was released.  R. 833.

On March 30, 2016, Lewis went to the emergency room at Blessing Hospital because her right hip replacement dislocated.  She had previously gone to the emergency room with hip dislocations on January 17, 2016, February 4, 2016, February 7, 2016, March 5, 2016, and March 26, 2016. Lewis had a total of 10 dislocations since the surgery.  R. 837.  The hospital notes stated that "she had multiple admissions for dislocations and many of those have been associated with acute alcohol intoxication."  R.

838.  Lewis reported on March 30, 2016, that she was getting up in the middle of the night for a drink.  She twisted her hip when she turned out the light and the hip replacement popped out and dislocated.  R. 835, 838.  She also reported neck problems, but no pain anywhere else.  R. 834.  Lewis reported that she was unable to wear her brace because it was much too heavy for her.  Lewis said she had cut way back on her drinking, but it was unknown to the emergency room personnel whether she was drinking the day before when the hip dislocated because no laboratory samples were taken.  R. 835.  Lewis reported that, "she tries to walk with her walker all the time, but this is also becoming difficult for her and she would like to be evaluated for a wheelchair."  R. 834.  The brace manufacturer told hospital personnel that the weight of the brace could not be changed very much.  R. 835.  Lewis was admitted as an inpatient and Dr. Crickard was called in for a consultation.  R. 837.

Dr. Crickard scheduled inpatient physical therapy and occupational therapy to help Lewis wear the brace.  Lewis wanted a wheelchair, but Dr. Crickard explained that she would become more dependent and could dislocate her hip every time she bent over to pick something up while in the chair.  R. 835.  Lewis was discharged on March 30, 2016.  R. 839.

On April 13, 2016, Lewis went to the emergency room at Blessing Hospital because her hip replacement was dislocated.  Emergency room physicians reduced the hip replacement back into place.  She was released.  R. 841.

On April 13, 2016, Dr. Schroeder prepared form entitled "Medical Source Statement of Ability to do Work-related Activities (Physical)."  R. 751-54.  Dr. Schroeder opined that:  Lewis could lift and carry less than 10 pounds; stand and walk less than two hours in an eight-hour workday (workday); sit less than two hours in a workday; change positions every 30 minutes while sitting; change positions every five minutes while standing; could not walk around during a workday; would need an opportunity to change positions while sitting and standing during a workday; need to lie down more than five times during a workday; never twist, stoop, crouch, climb stairs or ladders, or reach; frequently handle, finger, and feel; occasionally push or pull; be off work more than four days a month; not be off-task during a workday; and need to take more than five unscheduled breaks in a workday.  Dr. Schroeder stated that Lewis was so limited because she had a vertebral fracture at C-2 and chronic hip dislocation, recurrent.  R. 751.  Dr. Schroeder did not opine on when Lewis's condition started.  R. 754.

On May 12, 2016, Lewis was admitted to Saint Francis Medical Center in Peoria, Illinois, to undergo cervical spinal surgery. R. 890. Imaging studies showed severe stenosis at the craniocervical junction with cord impingement, worsening cord edema, and degenerative changes at C3-4 and C4-5. R. 946, 948. Lewis reported that her condition worsened over the last three weeks. She said she could not ambulate by herself over that period due to weakness on the right side and loss of balance. She reported a cold sensation along her back; stinging, needle like pain along her extremities; and difficulty swallowing. R. 890. Dr. Daniel Fassett, M.D., performed the cervical spine surgery on May 16, 2016. A post-operative CT scan showed significant improvement in cervical alignment and decompression at C1-C2 level and fusion hardware and bone graft material from C2 to C5. R. 954. Lewis did fairly well after the operation. She did not experience pain in her arms. Her strength was decreased but improving. On May 23, 2016, Lewis was discharged to Blessing Hospital's rehabilitation department. R. 891.

On May 23, 2016, Lewis was transferred to the Blessing Hospital rehabilitation department for acute inpatient rehabilitation to improve her function, including physical therapy and occupational therapy. Lewis continued her gabapentin, hydrocodone, and a muscle relaxant Zanaflex

for pain.  R.  843.  Lewis was discharged on June 9, 2016.  The therapist

noted improved function.  She could walk 150 feet with a walker.  She

could sit up in bed, sit in a chair, stand, and perform her personal care with

supervision, but without assistance in performing these tasks.  R. 845.

On June 13, 2016, Lewis went to the emergency room at Blessing

Hospital because her hip replacement was dislocated.  Lewis reported that

she bent over greater than 90 degrees and felt a pop.  Her blood alcohol

level was normal.  On June 14, 2016, Dr. Crickard reduced her hip

replacement back into proper position.  R. 847, 850-51.

On June 23, 2016, the Illinois Department of Human Services

Division of Rehabilitation Services approved Lewis to receive a personal

assistant in her home to assist her with cooking, cleaning, and personal

grooming.  R. 994-99.

On July 2, 2016, Lewis came to the Blessing Hospital emergency

room with a right hip replacement dislocation.  Lewis had a blood alcohol

level of .327 at the time.  R. 804-05.  Lewis said she was walking along,

and her hip dislocated.  Lewis said that she had not drunk alcohol in the 30

days prior to this incident.  Lewis said that she did not use a cane or a

walker.  R. 853.  Dr. Luke Harmer, M.D. reduced the hip replacement back

into place on July 3, 2016.  Dr. Harmer and Lewis "reviewed posterior hip

precautions today, which the patient is not particularly interested in listing (sic) to or adhering to." R. 854. Lewis was released on July 3, 2016.

On September 19, 2016, Lewis saw Dr. Fassett for a follow up on her neck surgery. Dr. Fassett stated that before the operation, Lewis could not walk for three months and had severe weakness in all her extremities. Lewis reported at this visit that she could walk. She reported manageable neck pain. She reported midline pain in her mid-thoracic region of her spine. Dr. Fassett was excited over the fact that she was already walking. Dr. Fassett stated, "I suspect that she will always have some issues with her strength, coordination, and sensation, but would expect her to continue to see improvements over the next nine months." R. 1006.

On September 29, 2016, Lewis saw Dr. Schroeder. Lewis walked in alone at the visit. She did not use a wheelchair. Lewis said that she was without hydrocodone the previous two weeks. She said during that two-week period, she had "significant reduction in the quality of her life due to pain." R. 1058. Dr. Schroeder stated that "Angela looks the best I have ever, ever seen her. She is alert, witted and smiling/laughing talking about her children. Then in the next breath she will tell me her pain issues. I cannot see where she needs more than tramadol, and why would it be

increased if she is in the good of shape?" Dr. Schroeder prescribed tramadol for pain. R. 1060.

On November 20, 2016, Lewis saw Dr. Schroeder for neck pain. Lewis reported severe pain in her neck and right arm. Lewis reported a loss of strength. Lewis reported not much pain in her hip. Lewis reported that she was not drinking alcohol. Dr. Schroeder administered a steroid injection for pain and gave Lewis a 30-day prescription for hydrocodone. R. 1077.

On December 4, 2016, Lewis saw Dr. Schroeder for neck pain. Lewis wanted more hydrocodone. Lewis reported that her neck was stiff. She said she could not see her surgeon in Peoria because she did not have transportation. She was waiting to see if her neurosurgeon in Quincy would see her for follow up on her surgery. On examination, Dr. Schroeder noted joint pain and muscle weakness. Dr. Schroeder referred Lewis for physical therapy, discontinued the hydrocodone, and prescribed Zanaflex (tizanidine) as needed for muscle spasms and Celexa (citalopram). R. 1081.

## THE EVIDENTIARY HEARING

On January 24, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 28-60.  Lewis appeared with her attorney.  Vocational Expert Barbara Myers also appeared by telephone.  R. 30.

Lewis testified first.  Lewis said she lived with her boyfriend.  She completed the twelfth grade.  She received training as a Certified Nurse's Assistant (CNA), but had not worked as a CNA in the last 15 years.  She previously worked as a waitress in a restaurant and as a gas station manager.  R. 33-34.

Lewis said she had hip surgery in November 2014.  Since then, she had about 10 hip dislocations.  She said her hip dislocations occurred while she was sitting or standing.  She said Dr. Crickard recommended wearing a brace.  She said she wore the brace part-time.  She did not wear the brace all the time because it was uncomfortable.  R. 35-36.[4]

Lewis testified that she drank alcohol.  She usually drank four to five beers at a setting.  R. 37.  She drank about once a week.  R. 44.  Dr. Crickard warned her against drinking when she was taking pain pills.  R. 37.

---

[4] The transcript identifies Dr. Crickard as Dr. Packard.  See R. 36-37.

Lewis said she went to the emergency room when her hip replacement dislocated.  She could not fix the dislocation by herself.  The doctors manually corrected the dislocation.  Sometimes she was sedated while they corrected the dislocation.  R. 37.  It took a few days to a week and a half to recover from the dislocation and the procedure to put the hip replacement back into place.  R. 38.  Lewis believed that her hip replacement was broken.  R. 50.

She had not dislocated her hip replacement since July 2016.  She said that she was still in pain every day in her hip and had pain walking or sitting.  She had the least pain sitting in a recliner or lying in bed.  R. 38-39.

Lewis testified that she had a neck fusion in May 2016.  She complained about neck pain in 2014, but the doctors didn't follow up quickly.  R. 38.  Lewis said her neck surgeon delayed her neck surgery several months.  R. 51.

Lewis said she was better since the neck surgery, but was still in constant pain.  R. 38-39.  She testified that the pains "shoot through my head to my neck down my arms."  R. 39.  She said the pain went down both arms to her fingertips.  The pain was constant four days a week, and off-and-on the other three days of the week.  Lewis said she could not move her neck much after the surgery.  Her neck hurt if she moved her

head right, left, up, and down.  R. 40.  Her neck hurt if she sat up in a chair.
She said that ice and heat did not relieve her neck pain.  R. 42.  The best
position to ease her pain was reclining in her recliner or lying down in bed.
R. 41.

Lewis said her pain woke her at least three or more times a night.
She sometimes took two hours to get back to sleep.  She could not sleep
on her back anymore and had to sleep on her side.  R. 47.

Lewis testified that since June 2016, the Illinois Department of
Rehabilitation Services had provided her with a personal assistant four
days a week.  The personal assistant cooked and cleaned her home.  42.
The personal assistant also took Lewis shopping.  R. 45.  Prior to having
the personal assistant, Lewis's boyfriend cooked, cleaned, shopped, and
helped take care of her.  R. 45-46.

Lewis testified that for approximately three months prior to her neck
surgery, she could not walk.  She used a wheelchair.  She walked with a
cane at the hearing and said she got the cane after her hip surgery.  She
used the cane for a while, but then stopped using it.  She resumed using
the cane due to her neck pain.  R. 42.

Lewis testified she had problems using her hands prior to the neck
surgery.  After her surgery, she still had problems with numbness and

tingling in her hands, as well as reduced grip strength.  Lifting a gallon of milk caused her pain.  Reaching caused her pain in her neck.  R. 43.  She did not bend over because of her pain.  She said bending over caused pain in her hip and neck.  She used a grabber tool to pick up objects on the floor.  R. 44.  She was not supposed to bend even halfway over.

She took gabapentin and hydrocodone for pain and said the hydrocodone barely relieved some of the pain.  The gabapentin did not affect her pain.  R. 44-45.  She could bend enough to sit in a chair but was not supposed to reach while sitting.  Reaching primarily hurt her neck, but also hurt her hip.  R. 49-50.

Vocational expert Myers then testified.  The ALJ asked Myers the following hypothetical question:

> [I]'m going to ask you to assume a hypothetical individual of the claimant's age, education and past work experience. This individual would be limited to light work, they could never climb ladders, ropes or scaffolds, they could occasionally climb ramps and stairs, balance and stoop. They could occasionally kneel, crouch and crawl. This person should never be exposed to unprotected heights, moving mechanical parts or vibration and they should never operate a motor vehicle as a job duty. This person would be limited to working in an environment with a moderate noise level. Can that individual perform any of claimant 's past work?

R. 56.  Myers opined that the person could perform Lewis's prior work.

Myers also opined that Lewis could perform the jobs of cleaner/

housekeeper, with 300,000 such jobs in the national economy; and cashier, with 800,000 such jobs in the national economy.  R. 56.  The ALJ adjusted the hypothetical question by asking Myers to assume the person was limited to sedentary work.  Myers opined that such an individual could perform the job of addressing clerk, with 21,500 such jobs in the national economy; and document preparer, with 16,500 such jobs in the national economy.  R. 57.

Myers opined that if the hypothetical person needed to use a cane to walk, she could not perform the light work jobs identified, but could perform the sedentary work jobs identified.  R. 57.

Myers opined that the person could not work if she could not reach and could only occasionally push or pull.  Myers said that the person could not be absent from work two or more days a month.  R. 58.  The hearing then concluded.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on April 12, 2017.  R. 10-21.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ determined that Lewis met her burden at Steps 1 and 2.

She was not engaged in substantial gainful activity and she had the severe

impairments of status-post total right hip replacement with repeated

dislocations, and cervical and lumbar degenerative disc disease.  R. 12.

The ALJ determined at Step 3 that Lewis's impairments or combination of

impairments did not meet or equal a Listing.  R. 14.

At Step 4, the ALJ found that Lewis had the following RFC:

> After careful consideration of the entire record, I find that the
> claimant has the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a) except that the claimant can occasionally climb
> ramps and stairs, but never climb ladders, ropes, or scaffolds.
> She can occasionally balance and stoop, and less than
> occasionally kneel, crouch, and crawl. The claimant should
> never be exposed to vibration, unprotected heights, or moving
> mechanical parts. She should never operate a motor vehicle as
> a job duty.

R. 14.  The ALJ relied on the medical evidence that Lewis was not

compliant with the instructions of Dr. Crickard and other health care

professionals regarding hip precautions, was not compliant with wearing

her hip brace, and was not compliant in avoiding alcohol even though

alcohol relaxed her hip and led to dislocations.  The ALJ found that if Lewis

complied with her medical advice, her hip would allow her to function consistent with the RFC determined by the ALJ.  The ALJ further relied on the numerous examinations by Drs. Schroeder, Crickard, and Kozma that found full range of motion and normal strength in her neck, back, and upper extremities.  The ALJ relied on the findings by Dr. Fossett that Lewis's neck surgery resulted in marked improvement in cervical alignment.  The ALJ also relied on the fact that Lewis delayed her neck surgery voluntarily.  The ALJ noted that Dr. Schroeder offered to provide transportation to Peoria to have the surgery, but Lewis declined.  The ALJ also found that Lewis could have afforded transportation to Peoria for the surgery if she had diverted funds used for the purchase of alcohol to fund the trip.  The ALJ based this finding on a statement made by Dr. Schroeder.  R. 1022.  The ALJ found that Lewis could perform the limited range of sedentary work defined in the RFC after the improvements from her neck surgery.  R. 15-18.

The ALJ gave little weight to Lewis's testimony regarding her symptoms because the testimony was inconsistent with the medical evidence discussed above.  The ALJ noted that her doctors worried about overuse of and repeated requests for hydrocodone.  The ALJ found that these concerns support the inference that Lewis exaggerated her pain symptoms to secure more hydrocodone.  As a result, her symptoms claim,

"may not be entirely consistent with her need as based on the medical findings." R. 16. The ALJ also noted that Lewis's statements to medical providers were inconsistent in some respects. On August 13, 2015, she told Dr. Reynolds that she refused to use a cane or walker. R. 679. On March 30, 2016, she told emergency room staff that she tries to walk with a walker all the time. R. 834. She then told Dr. Harmer on July 3, 2016, that she did not use a cane or walker. R. 853. The ALJ found that these inconsistencies "are not consistent with her allegations of disabling pain and suggest a lack of concern with her overall physical condition." R. 16. The ALJ noted that medical records indicated Lewis was "absolutely belligerent in her belief that she will not follow hip precautions. She shows no remorse whatsoever at having not been following her precautions at the time of dislocation." Lewis self-discharged herself from physical therapy and was not compliant with therapy and was not cooperative with occupational therapy and refused services. She refused to sign a behavioral contract with her physical therapist that showed her commitment to attending scheduled appointments and understanding treatment compliance. R. 16.

The ALJ further gave little weight to the April 13, 2016 Medical Source Statement from Dr. Schroeder. The ALJ discounted Dr.

Schroeder's opinions because Dr. Schroeder was a family doctor and not a specialist.  The ALJ also found that Dr. Schroeder's opinions were not consistent with the other medical evidence in the record. R. 18.

The ALJ determined at Step 4 that Lewis did not have past relevant work.  The ALJ, therefore, proceeded to Step 5.  At Step 5, the ALJ found that Lewis could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of Vocational Expert Myers.  The ALJ found that Lewis could perform the representative occupations of addressing clerk, with 21,500 jobs in the national economy; and document preparer, with 16,500 jobs in the national economy.  The ALJ concluded that Lewis was not disabled.

Lewis appealed.  On February 26, 2018, the Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Lewis then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The

evidence supports the ALJ's findings that Lewis would not have significant

dislocations of her hip replacement if she complied with Dr. Crickard's

instructions.  As a result, the evidence supports the ALJ's conclusion that

she could perform a limited range of sedentary work if she complied with her doctors' instructions. The evidence from Dr. Fossett supports the inference that Lewis's impairments from her cervical spine have been substantially improved as a result of her neck surgery. This evidence also provides substantial evidence to support the inference that Lewis could perform a limited range of sedentary work set forth in the ALJ's RFC.

The ALJ's decision not to give weight to Lewis's testimony regarding her symptoms is also supported by the evidence. Drs. Crickard and Schroeder both expressed concerns that Lewis was seeking hydrocodone. Their concerns provide substantial evidence to support the ALJ's findings that Lewis may have exaggerated the level of her pain to secure the drugs. Lewis's inconsistent statement regarding whether she used her cane and walker also constitute substantial evidence to support the ALJ's decision to give less weight to her testimony and more weight to the medical evidence on which the ALJ relied.

Substantial evidence also supported the ALJ's decision to give little weight to Dr. Schroeder's opinions. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608

(7th Cir. 2008).[5]  The ALJ found that Dr. Schroeder's opinions were not consistent with the other medical evidence in the record.  Dr. Schroeder opined that Lewis was limited to less than sedentary work because of her chronic hip dislocations and a vertical fracture at C2.  As discussed above, the medical evidence showed that Lewis could avoid hip dislocations by complying with Dr. Crickard's hip precautions, including wearing her hip brace and avoiding alcohol.  The medical record further shows that a month after Dr. Schroeder issued her Medical Source Statement, Dr. Fassett performed surgery on Lewis's neck to address the fracture and improve the alignment of Lewis's cervical spine.  The ALJ could conclude that Dr. Schroeder's opinion did not consider the results of the second surgery, and so, was not consistent with the other medical evidence. This evidence provides substantial evidence that Dr. Schroeder's opinions were not consistent with the other medical evidence in the file.

The ALJ also gave Dr. Schroeder's opinions little weight because she was not a specialist.  Once Dr. Schroeder's opinions were not entitled to controlling weight, the ALJ considered them as he would other medical

---

[5] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

evidence.  20 C.F.R. § 404.1527(c).  The fact that Dr. Schroeder is not a specialist is a relevant factor in evaluating her opinions.  20 C.F.R. § 404.1527(c)(5).  The record provides substantial evidence to support the ALJ's treatment of Dr. Schroeder's opinions.

Lewis makes a two-sentence argument that the ALJ should have considered Lewis's probable absenteeism and her ability to work.  Lewis Motion, at 7 of 9.[6]  Lewis testified that she needed up to a week and a half to recover from a hip dislocation and a reduction procedure to correct the dislocation.  Lewis does not develop this argument and does not cite any authority to support it.  As such the argument is waived.  Long v. Teachers' Retirement System of Illinois, 585 F.3d 344, 349 (7th Cir. 2009).  Moreover, the ALJ relied on substantial evidence that Lewis's dislocations were due to her failure to comply with her doctor's orders, not with her impairment.  If she was compliant, the prospect of chronic absenteeism would not exist.

Lewis also cites evidence in the record which she states shows she is disabled.  Lewis essentially asks the Court to reweigh the evidence.   This Court may not substitute its judgment for the ALJ's or reweigh the evidence.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.  The decision of

---

[6] The Lewis Motion is not paginated.  The Court refers to the pagination assigned by the Court's CM/ECF system.

the ALJ is supported by substantial evidence.  The decision of the ALJ should be affirmed.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 15) should be ALLOWED, and Plaintiff Angela Lewis's Brief in Support of Motion for Summary Judgment (d/e 13) should be DENIED.  The decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   April 9, 2019

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE